### MILLER *vs.* JAMISON and others.

The ownership of property at the time of the execution of an attachment, *held* to have been in the debtor, though the title was in another, and so taken, by reason of the embarrassed circumstances of the debtor, that it might be beyond the reach of his creditors. And a conveyance by the auditors, under the attachment, *held*, to have conveyed a valid title to the property ; a deed from the party so holding title in trust for the debtor, declared fraudulent, and the trustee decreed to execute a conveyance to the purchaser under the attachment; and a mortgage, executed by the grantee of the trustee, declared invalid, by reason of actual notice to the mortgagee, of the attachment and the claims of the creditors under it.

On final hearing, on pleadings and proofs.

*Mr. F. F. Westcott*, for complainant.

*Mr. F. Kingman*, for defendants.

THE CHANCELLOR.

The complainant, a creditor of Charles B. Dungan, is the purchaser, at auditors' sale, in foreign attachment, of the right, title, and interest of Dungan in a cottage and lot of land in Cape May city, known as the "Tilge Cottage." The attachment was issued on the 2d of September, 1865, and was executed on the 13th of the same month. The auditors' sale took place on the 15th of April, 1869, and their deed to the complainant is dated on the 15th of May following. At the time of the issuing and execution of the attachment, the title to the property in question was in James S. Dungan, a son of the debtor. He, subsequently, and on the 6th of November, 1865, about two months after the execution of the attachment, executed a deed for the property in fee to his aunt, the defendant Mrs. Jamison, the debtor's sister. She, on the 27th of September, 1870, executed a mortgage on the property to her sister, the defendant Mrs. Scattergood, to secure the payment of $2500.

The bill alleges, that at the time of the execution of the attachment, the debtor, Charles B. Dungan, was the owner of the property; that he had paid for it $5800; that it was held in trust for him by his son, to whom he, being pecuniarily embarrassed, had caused it to be conveyed, to put it beyond the reach of his creditors; that, with the like design and object, and to effectuate the same fraudulent purpose, he caused his son to execute the deed to Mrs. Jamison, after the execution of the attachment, and that Mrs. Scattergood's mortgage, made in 1870, was taken with full notice of the attachment. It prays an account of the rents and profits of the property from Mrs. Jamison; that the auditors' deed may be decreed to convey a good and valid title, and that the deed

from James to his aunt may be decreed to have passed no title to her, or that she may be decreed to convey the property to the complainant. The defendants have all answered.

That Charles B. Dungan, the debtor, was embarrassed by his debts at the time of the purchase of the property, which was about the 18th of March, 1865, is, notwithstanding his positive and unequivocal denial in the answer, proved beyond all controversy. The testimony of Mrs. Jamison herself furnishes abundant evidence, not only of the fact, but that she was fully aware of it. That he purchased the property, and paid for it with his own money, and that he caused it to be conveyed to his son, James, who held the title when the attachment was executed, and who was then not yet twenty-two years of age, is admitted. But, it is insisted, that the purchase of the property was made by the debtor, not for himself, but for Mrs. Jamison ; that he was indebted, to the amount of over $12,000, to her husband, who died in 1860, and that, after the settlement of Mr. Jamison's estate by his executors, they had delivered over to her, as legatee under the will, a schedule of certain debts, including that of Charles B. Dungan, which were either deemed uncollectible or difficult of collection, or which had not been collected because of reluctance to press for payment ; that Mrs. Jamison, being desirous of purchasing the cottage, and her wish being made known to Charles B. Dungan, he proposed not only to conduct the negotiations for the purchase with the owner, with whom it was supposed he could deal with better advantage, but to buy the property for her, and pay for it with his own money, asking only that the purchase money might be credited on the debt due from him to her husband's estate. The improbability of this account of the transaction is clearly manifest. Mrs. Jamison admits that she knew her brother was " in trouble "—that he was embarrassed pecuniarily. She says she had asked for payment several times before the purchase of the cottage, and that he had never paid her anything ; that when she asked for payment, he said he thought he would pay in a short time, and that his business was such.

that he could not do it. Duncan White, who is the debtor's brother-in-law, he having married Charles B. Dungan's sister, testifies, that before the purchase of the cottage Mrs. Jamison had applied to Dungan for $5000 of the money due her, and he had not paid it, though he said he was anxious to raise it for her. Besides, both Charles B. Dungan and his son, James, give as a reason for taking the title in the name of the latter, that they proposed to raise $2500 on a mortgage of the property, for the purposes of James' business, which appears to have been his father's also. Charles B. Dungan says that he endeavored to get Tilge, the owner of the property, to take a mortgage for so much of the purchase money, but he insisted on the payment of the whole of the $5800 in cash. It seems quite incredible that Charles B. Dungan, who was notoriously embarrassed in his pecuniary affairs, should have voluntarily, unnecessarily, and unexpectedly interposed, as Mr. White alleges he did, in the transaction of the proposed purchase of the property by Mrs. Jamison, and have offered, not only to negotiate for her, but to pay the purchase money ($6000, if the property could not be bought for less,) in cash, in consideration of an old debt due from him to his wealthy sister, especially when, according to his own statement, it was important to his business operations that he should have $2500 of the money for use therein.

In the answer, which is joint and several, Charles and James say that it was understood by them, at the time of the conveyance, that Mrs. Jamison would permit James, who, they say, had recently entered into the business of furnishing railroad ties, to borrow the sum of $2500 on the property, and, for this purpose, Charles requested Tilge to take a mortgage on the premises for that amount, as part of the purchase money; but Tilge refusing to take a mortgage, and a difficulty being suggested about the bond and mortgage of a woman, in case the conveyance should be made to Mrs. Jamison, and she should give the mortgage, it was thought advisable to have the title to the property conveyed to James temporarily, and

until he could negotiate the required loan, and then he would
convey the property to Mrs. Jamison.   They further say,
that the conveyance was thus made to James for his own
convenience, and without Mrs. Jamison's knowledge or con-
sent.   Now, in the first place, the purchase was closed in the
office and under the supervision of a counsellor-at-law of this
state, of learning and experience in business, by whom the
most careful searches of the records in respect to the title of
the property were made.   He was employed by Charles B.
Dungan.   He could not have advised the Dungans that the
bond of Mrs. Jamison, who was a widow, would be objec-
tionable; indeed, he testifies, that he remembers no conver-
sation in the transaction on that point; and surely the obliga-
tion of this lady, who, as appears by the answer, received
from her husband's estate a fortune of upwards of $150,000,
(or as the witness, White, says $200,000, or $225,000,) would,
among money lenders, have been preferred to that of James,
who was but just of age, and apparently without property.
On this point, Mrs. Jamison testifies, that she does not know
what business James was in in 1865; that she does not know
that he was then in the railroad tie business; that there was
something said, at some time, about the title to the cottage
remaining in James' name, in order that he might mortgage
it to raise money with which to carry on his business, but it
was not said to her, and she does not know to whom it was
said; that she knows nothing about that arrangement; that
she cannot say when she first heard of it; that there was
nothing said on the subject till after the attachment; that
neither Charles nor James ever requested her to allow James
to take the title of the property, and that nothing was ever
said to her about there being a difficulty in the way of a
woman making a mortgage, or that the title should not be in
her.   Tilge says nothing was ever said to him during the
transaction of the sale and conveyance, about a "woman giv-
ing a bond and mortgage."   Charles B. Dungan's testimony
on this head is, that he "has an impression that he talked
with Mrs. Jamison about raising money on a mortgage on the

house," and that "Mrs. Jamison expected to put a mortgage upon the cottage property for James, herself." But it will have been seen that she flatly contradicts this last statement. The counsellor above referred to testifies, that he did not understand that the property was bought for Mrs. Jamison, until after the attachment was brought, probably in September, 1865; about the time when, at Charles P. Dungan's request, he went to Cape May City to see Mrs. Jamison in regard to the property.

Nor are the witnesses of the defendants consistent with each other; nor is their testimony consistent with itself in regard to the circumstances of the purchase. In the answer, they say that Mrs. Jamison, in the year 1864, rented the premises of Tilge, and occupied them during the summer of that year, for her residence; that, finding the property suitable and agreeable for a summer residence, she concluded to purchase it, and requested her agent (her brother-in-law, Duncan White) to negotiate with Tilge for the purchase of it, and he reported to her that Tilge would sell it for $6000; that she thereupon conferred with Charles B. Dungan, who was well acquainted with the value of the property in that neighborhood, and requested his opinion in reference to her contemplated purchase; that he stated to her that in his judgment, the property was a desirable one, and offered to purchase it for her, stating that he was well acquainted with Tilge, and could probably buy the property for less than $6000; that he also, at the same time, stated to her that as he owed the estate of her husband a large sum of money, he would purchase the property for her and pay the purchase money for her, and that the amount should be credited on account of his indebtedness to her; that with this understanding, he, at her request, negotiated with Tilge for the property, stating to him that he wished to purchase it for her, and shortly afterwards bought it for her, for the sum of $5800, and communicated the fact to her; and thereupon, her agent, White, by her directions, immediately credited him with the amount of the purchase money against his indebtedness, and returned to him certain stock

then held by the estate as collateral security for the payment of the debt. Now, White's statement of the transaction, in his testimony, is, that Mrs. Jamison requested him to see Tilge and ascertain his price; that he did see him, accordingly, and found that he asked $6000 cash; that he informed her of the terms; that afterwards, the next time he went to Philadelphia (he lived at Norristown, where Mrs. Jamison resided), he stopped at Charles B. Dungan's office and told him he had been to see Tilge, and what price the latter asked for the property, and asked Dungan whether he (Dungan) could buy it cheaper than he (White) could; and that Dungan said: "I am glad I met you; I wanted to pay Aunt Harriet (Mrs. Jamison), and will purchase the cottage for her." White says he asked Dungan if he would be certain to attend to the matter, adding that if he would not, he (White) would do it himself; and that Dungan replied: "Don't trouble yourself; I want to do it." He says: "That is all the conversation we had on the subject. I left the matter with him. The following week, Mrs. Jamison received a letter from Dungan on the subject, which she showed to me. I immediately went to Cape May. I went there as her agent, at her request, and took possession of the property."

Mrs. Jamison testifies that she was desirous of buying the property, and sent White to ascertain the price; that he went, and reported to her; that she resolved to take the property, and sent White to buy it, and White, on his return, said he had met Dungan, and that the latter said he would buy the property for her, and that the consideration might go on account of his indebtedness to her; that she left the matter in Dungan's hands, to complete the purchase, and she next received a letter from him, stating that the property was hers, and that she might go down and make whatever improvements she wished.

It will be seen that these statements are at variance with those of the answer above quoted. There was no conference between her and her brother, nor any request by her for his

opinion as to the value of the property. Nor did he give her any opinion as to the desirableness of the property, &c., but, on the other hand, there appears to have been no interview at all between them, in reference to the purchase, after she sent White to Tilge. Both Mrs. Jamison and White, in their testimony, speak of Duncan's intervention as occurring through and after the conversation between him and White, after the latter had seen Tilge. White was recalled after Mrs. Scattergood, Mrs. Jamison, and James S. Dungan had concluded their testimony, and then said that, after seeing Tilge, he expected to have got the property for $5000, but finding he asked $6000, he talked with Mrs. Jamison on the subject, and she suggested that Dungan was well acquainted with Tilge, and said she wondered whether he could not purchase it for less.

Dungan says he suggested to her that she should buy the cottage, and that White spoke to him about the property before the purchase, and he (Dungan) told him he thought he could negotiate the matter better with Tilge than any stranger, as Tilge had talked to him about the sale of the cottage, frequently, while he (Dungan) was building the railroad. He adds : " I was therefore desired to negotiate the purchase of the property." He subsequently says : " I did not have many conversations with Mrs. Jamison before the property was purchased ; the first conversation I had with her was shortly prior to the purchase. I have no recollection of anything being said, at that time, about applying the purchase money of the cottage to my credit, on my indebtedness to the Jamison estate ; when I saw Mr. Tilge, and learned that the property could be bought for $6000, I spoke to her on the subject. It was in a conversation held after that time, with her, that it was agreed that the purchase money should be applied as above stated. After that, I made the final bargain with Tilge. The conversations with Mrs. Jamison were held mainly at her house in Norristown. I think it was in the conversation just before the purchase, that I made the suggestion to her about James

borrowing money on the house." These statements in regard to Charles B. Dungan's interposition and action in the purchase, are not in accord with each other.

In the answer, the defendants say that Mrs. Jamison occupied the cottage, as tenant of Tilge, during the summer season, in 1864, the year previous to the purchase. In the testimony, the time is changed, first to 1863, and then to 1862, while there seems to be grave reason to doubt whether she ever occupied it at all, before the purchase by Dungan. In the answer, it is stated that the $500 paid at the making of the bargain, was paid by James. The proof is, that it was paid by his father.

The statement of the answer, that credit for the amount of the purchase money was immediately given to Dungan on the debt to Jamison's estate, is not sustained by the evidence. The debits of the account in which the credit is alleged to have been given, were evidently all written at once. That side of the account consists of the alleged amount due from Dungan to Jamison's estate in 1860 or 1861, and interest up to 1865. The credits are in lead pencil, and consist of a credit of all the interest, $2227.37, which White says Mrs. Jamison, after the purchase, was willing to forgive, (although she was not willing to discharge the whole debt,) and the following items: By Cape May house, $5800; deeds, searches, &c. The last two items are in blank, as to amount. There is no evidence as to when these entries were made. They are not only suspicious, but they tend to induce the conclusion that the transaction, of which they form part, was fraudulent. It does not appear that any receipt was given to Dungan, nor any asked for. He does not appear to have even asked that he be credited on the books with the money. White says that Mrs. Jamison was unwilling to discharge Dungan from the balance of the debt. Notwithstanding this unwillingness, she gave up to him, they say, the collaterals she held.

But there are other considerations in this case. The money with which the purchase money was paid, was admittedly Charles B. Dungan's. He purchased the property; he caused

it to be conveyed to his son. The property was his when the attachment was executed. At that time Mrs. Jamison had parted with nothing valuable as consideration for his agreement to buy the property for her. Although she gave up, as they say, certain collaterals which she held, it does not appear when they were given up ; and it appears, by White's testimony, that she considered them of no value to her. Though she and White and Mrs. Scattergood, all speak of a letter (not produced) which they say she received from him, informing her that he had bought the property for her, they do not say that he even pretended in that letter that he had caused the property to be conveyed to her. When the deed from James to her was executed, she knew of the attachment, and she had not then improved the property to any considerable extent ; for, White says, her payments for "expenses connected with the property" in 1865, were $68. The creditors under the attachment acquired a lien on the property which was superior to any claim of hers.

According to her statement, Dungan had agreed to buy the property and pay the purchase money for her, and she was to give him credit on the old debt for the amount paid. He bought the property and paid for it with his own money, took the title in the name of his son, and did not convey it to her. If she had given him any credit, based on the purchase, he was not entitled to it. If, on the faith of the purchase, she had returned to him valuable securities, (as she had not,) he had defrauded her. She had, under the circumstances, no claim upon the property which she could enforce as against the creditors under the attachment.

Mrs. Scattergood, as before stated, is the sister of Mrs. Jamison, and lived with her during the whole time of the transactions under consideration in this suit. Her mortgage was not taken until 1870, five years after the execution of that attachment. She undoubtedly had actual notice of the attachment in 1865, and knew that the creditors of her brother Charles claimed that the property was, in fact, his. Nor does

there appear to be any reason why Mrs. Jamison should have selected this property for a mortgage to Mrs. Scattergood.

They say the mortgage was given to secure the payment of a legacy of $1000, given to her by Mr. Jamison's will, and an indebtedness of his estate to her for money lent to him and put into his business, and money which he directed to be paid to her as a gift over and above the legacy.

Mr. Jamison died in 1860. His estate was settled prior to 1865, and his widow, as residuary legatee, according to the answer, came into possession of property of the value of $150,-000—according to Mr. White, of the value of $200,000 to $225,000. Why these claims of Mrs. Scattergood had not been paid in the settlement of the estate, does not appear. Her mortgage ought not to be permitted to prevail as against the complainant's title.

There will be a decree that Mrs. Jamison account for the rents and profits. She will be allowed all taxes paid by her ; and for improvements, the amount which they added to the value of the property. Her deed will be declared to be fraudulent, and of no effect, as against the complainant's title, and James S. Dungan will be decreed to have held the property in trust for Charles B. Dungan, and to execute a conveyance in fee to the complainant therefor, accordingly.